CURTISS-WRIGHT CORPORATION, Plaintiff, *v.* VILLAGE OF GARDEN CITY, Defendant.

Supreme Court, Special Term, Nassau County, June 11, 1945.

*Kenneth M. Spence* and *David B. Tolins* for plaintiff.

*George L. Hubbell, Jr., Vincent W. Farley* and *Renwick W. Hurry* for defendant.

LOCKWOOD, J. This litigation between the Curtiss-Wright Corporation and the Village of Garden City concerns the use to which the Curtiss-Wright plant may be put and the effect thereon of certain zoning ordinances.

On December 27, 1917, the Garden City Company which originally owned most of Garden City, sold the Curtiss Engi-

neering Company, predecessor of Curtiss-Wright Corporation, twenty acres at the corner of Clinton and Stewart Avenues.

The deed restricted the property to " an experimental laboratory for the manufacture, exposition, testing and sale of airplanes and accessories and the necessary buildings and structures connected therewith * * *."

By later agreement, the permitted use was broadened, except that no livery stable, slaughter house, boiler factory, brass or iron foundry was allowed.

On this cite, the Curtiss-Wright plant was completed in 1919 at a cost of over $1,100,000.

The Village of Garden City, incorporated in September, 1919, adopted two zoning ordinances, one on April 19, 1921, and one on March 7, 1924.

Under both, the Curtiss-Wright property was placed in a residence district.

The one of March 7, 1924, provides: " Sec. 200. Any non-conforming use existing in any building at the time of the adoption of this ordinance may be continued, and any existing building designed, arranged, intended or devoted to a non-conforming use, may be reconstructed or structurally altered, and the non-conforming use therein changed subject to the following regulations:

" 1. The structural alterations made in such building shall in no case exceed fifty percent of its appraised value, nor shall the buildings be enlarged, unless the use therein is changed to a conforming use.

" 2. No non-conforming use shall be extended at the expense of a conforming use.

" Sec. 201. Nothing in this ordinance shall * * * prevent the continuance of the use of such building or part thereof or prevent a change of such existing use under the limitations provided in Section 200."

Differences developed after the adoption of the zoning laws and the village officials acted on a number of complaints. To one against noise, Curtiss-Wright replied that the airplane motor tests objected to were being conducted for the United States Navy but that they would thereafter be made at Buffalo, New York.

The Garden City Curtiss-Wright plant closed down during the depression in 1932. Some machines were moved to Buffalo. Others remained at Garden City and were sold off from time to time up to 1935 or 1936. At all times Curtiss-Wright kept records and a custodian and a watchman, and, for a while

an accounting force on the premises. Light, heat, power and water were always available.

Between 1932 and 1940, part of the property was leased for restaurant purposes, other space to Nassau County for adult education quarters and one building to Doubleday, Doran & Co., Inc., publishers, for storage. From October, 1940, to date all, except the space used by Curtiss-Wright, has been under lease to Sperry Gyroscope Company.

These rentals, all for nonconforming uses permitted by the restrictive covenants of record, were made upon application to, and with the approval of the village authorities.

On September 20, 1940, the village Board of Zoning Appeals granted a limited permit for the Sperry occupation on condition: " (4) that the granting of this appeal and anything done hereunder shall be without prejudice to the rights of the appellant (Curtiss-Wright) * * * or of the Village * * * as such rights existed prior to the filing of this appeal or with respect to any questions which might have been or might be urged by any of said parties in any future action or proceeding, whether judicial or otherwise, with respect to said property, whether or not such proceeding shall be instituted by further application to this Board or otherwise, and that the rights of all said parties, their successors or assigns shall be fully preserved."

In the early fall of 1944, when all plants were being urged by the President and the Secretaries of War and of the Navy to increase production to the maximum to further the allied cause, the application to extend the Sperry lease one year from December 1, 1944, was denied by the village board because Curtiss-Wright insisted that the additions erected by Sperry at a cost of $325,000 to carry on Government work should not be later torn down without their consent. The village board had reserved the right to enter upon the premises at the end of the lease and demolish such buildings if Curtiss-Wright failed to do so.

It was not until February 10, 1945, that the board approved of the Sperry lease which had expired December 1, 1944, and it was extended to December 1, 1945.

During this last controversy, Curtiss-Wright instituted this action for a judgment declaring: (1) That its plant and property is devoted to a nonconforming, pre-existing, legal use and therefore the zoning ordinance of the Village of Garden City is void and ineffectual to prevent such use; and (2) that the zoning ordinance insofar as it restricts the use of the property

to uses permitted by the ordinance in a " B " residence district, is so unreasonable and confiscatory as to constitute an unconstitutional taking of the property.

The defendant village asserts that Curtiss-Wright *abandoned the nonconforming, pre-existing legal use of the property* — the active manufacture of airplanes and accessories — at this plant in 1932. That by shutting down manufacturing and renting out some of the buildings between 1932 and 1940 for nonconforming uses, as hereinbefore set forth, it lost its right to the nonconforming use, and the restrictions of the zoning ordinance of 1924 limiting the use of the property to residences only, became applicable.

That Curtiss-Wright's sole remedy for any grievance it may have against the decisions of the village Board of Zoning Appeals is a review by certiorari, the time for which has long since expired. It further denies the allegations of the unreasonableness and unconstitutionality of the zoning ordinance.

Curtiss-Wright says that the applications to the village authorities after 1932 for consents to temporarily lease parts of the property, were made to avoid friction. That it never had any intention of permanently changing the character of the plant, which, during all the years was and is assessed for taxes by the village on the basis of industrial use, far higher than assessments for residential use. That it presented the matter of the Sperry lease in 1940, not because the consent of the village was necessary to continue the nonconforming use, but to save time in getting important work for the Government under way and that its rights and the rights of the village were preserved under the stipulation herein quoted.

Curtiss-Wright points out that it manufactured airplanes here from 1919 to 1932, when it shut down because the nation was then going through the most severe depression in history; that many corporations and businesses, large and small, failed or closed in whole or in part at that time, awaiting the business revival which many thought was " just around the corner ". That, meanwhile, it rented out parts for nonconforming uses to obtain income. That instead of an upturn, 1933 brought a closing of the banks and more widespread unemployment, and that many plants remained closed and business continued bad, until the United States started to prepare to meet the conditions brought on by the World War, then under way in Europe.

That all the time it maintained employees and records on the premises.

. That this plant was always ready to resume operations upon short notice and that it was fortunate these buildings were available in 1940 for work in furtherance of aviation and electronics. That Sperry Company and its employees received high commendation and awards from the army and navy for instruments developed here, which protected the lives of many men in our air and ground forces.

Curtiss-Wright was a pioneer in aviation, investing $1,100,-000 in this property in 1917, ten years before the Lindbergh, Chamberlain, Byrd and other transatlantic flights arrested the attention of the world.

In the intervening years, aircraft activity on Long Island has increased rapidly. Now planes take off daily for transatlantic and transpacific flights and attract little or no attention. Mitchell and Roosevelt Fields, which have been enlarged and modernized, and La Guardia Field operate to capacity. The navy took over and extended Floyd Bennett Field. The big Idlewild Airport is under way.

Comparatively near to the Curtiss-Wright property are the great plants of Sperry at North Hills, Grumman Aircraft at Bethpage, Republic and Ranger-Fairchild at Farmingdale, and many others, making airplanes or parts or accessories so that Curtiss-Wright, almost alone here in 1917, is now in the center of a great industry.

The testimony, the photographs, the maps and visits to the property show that in 1918, when Curtiss bought and built, there were homes some blocks away to the west and southwest of this property. However, the main residential section of Garden City was then and is now quite far to the west and is served by the railroad stations at Nassau Boulevard, Garden City and Merillon Avenue. Country Life station serves Doubleday, Doran & Co., the publishers, a retail business section and some apartments and homes. Clinton Road station nearest to the plant, is not on a main line. It has a shuttle connection to Country Life station.

. To the north of Curtiss-Wright is Stewart Avenue and vacant land and a fine, new, well-setback village school. North of the school is a large open reservoir. Beyond that is vacant land and Roosevelt Field with many hangars, and the Old Country Trotting Course and stables. The Mott Homes development to the northwest is built east of the Long Island Rail Road freight line connecting Garden City and Mineola, and running past lumber and coal yards, stables, and the old Nassau County Fair Grounds.

East of Curtiss-Wright, within the village of Garden City, is the large A & P warehouse, now used by Sperry for its Electronics Division, and storage tanks of the Invader Oil Company. Just over the village line is the huge, high, striped gas tank and electric power installation of the Long Island Lighting Company, the L. E. K. Oil Co., Inc., Busch Fuel Company, McAdam & Co., Marion Engineering and Supply Co., Colt-Worthington Oil Co., Arrowhead Oil Co., Hermoil Lub. Corp., Brooklyn Builders Supply Co., a sand and gravel outfit, Sinclair Oil and Mitchell Field with its many buildings.

Immediately to the south is the Long Island Rail Road freight and passenger line, running from Garden City to Mitchell Field, Meadowbrook and Roosevelt Raceway. South of and between this railroad line and Commercial Avenue are old frame buildings put up during World War I for Camp Mills and now used as a warehouse by Estabrook Construction Co., the Franklin Shops, Inc., The Plowman Company, the Atlantic Aircraft Supply Corporation, J. S. McHugh & Co. and others. Across from them on the south side of Commercial Avenue is vacant land recently acquired by the village for park purposes. The street name *Commercial* clearly indicates the character of the neighborhood. To the west is landscaped vacant land of Curtiss-Wright, then two blocks of village park land and the Clinton Road Railroad station. Further west are residences.

The buildings on the Curtiss-Wright twenty acres are well set back, landscaped in front and have large parking spaces for employees' cars. The property is fenced in and presents the appearance of a well-kept, well-run plant. The approaches from the north, south and west have a heavy growth of trees which shield it from view, whereas the huge gas tank and Mitchell Field installations to the east, just over the village line, can be seen for many miles.

During intensive twenty-four-hour operation required by war needs, some Sperry employees may have parked cars, contrary to rules, near homes several blocks to the west beyond the Clinton Road station. Such inconveniences were to be expected in a nation during an all-out effort to supply millions of fighting men in the Allied armed forces in all parts of the world.

This property under Curtiss in peacetime gave employment to from 600 to 1,400, and under Sperry in wartime, to 2,500 skilled men and women.

Taxes assessed on industrial use values, far higher than for residential use, have been paid for twenty-eight years. The

village has also benefited by the purchasing power of the employees and of the many who visit or stay in Garden City, because of business with Curtiss-Wright or Sperry.

The assessed valuation of the property is, for 1945:

*For village taxes*

| | | |
|---|---|---|
| Land | ............................ | $ 63,000 |
| Building | ......................... | 344,600 |
| Total | ........................... | $ 407,600 |

*For county taxes*

| | | |
|---|---|---|
| Land | ............................ | 107,100 |
| Building | ......................... | 383,950 |
| Total | ........................... | $ 491,050 |

The course of conduct of the village officials over the years indicates clearly that they do not want this type of industry within the village limits.

If their contention is correct, Curtiss-Wright must demolish the buildings at the end of the permit for Sperry occupancy and sell off the land for residential purposes for which the village expert values the land at $70,000; plaintiff's expert at $40,000 less the cost of demolition estimated at $15,000; it would probably be much more.

The best proof of residential lot values here are the sales (February, 1945) by a Garden City Company subsidiary of 1,000 lots at $100 each, and by the Village of Garden City of 300 lots at $85 each, to Gross-Morton Corp., home builders. These lots, some of which have streets, sidewalks and sewers, lie several blocks to the south of the Curtiss-Wright plant. The price indicates a present value of $30,000 for use for home sites of the Curtiss-Wright twenty acres adjacent to the freight and passenger railroad track. Deducting the demolition, street, sidewalk, sewer and other improvement costs, would leave less than nothing.

The probable vacant residential lot value taken from the original investment, would let Curtiss-Wright absorb a loss of over $1,000,000. The $325,000 laid out for buildings and betterments in the last five years by Sperry or by the Government for Sperry would also be completely wiped out.

Compared to the assessed valuation figures, Curtiss-Wright would lose upwards of $500,000 and the cost of the Sperry additions would probably be borne by Uncle Sam.

Is it fair and just to destroy this plant and charge the loss to the stockholders of Curtiss-Wright?

After our country's costly experience with disarmament theories put into effect after World War I, would it, irrespective of who stands the expense, be good business, considering present world conditions, to tear down these buildings admittedly now very useful and giving employment to so many, if the village authorities had the unquestioned right to direct their demolition?

Only the westerly end of the site might be available for homes. Few would want homes on the parts of the property adjacent to the railroad freight line or on Commercial Avenue, or in the shadow of the huge gas and oil tanks and power installations.

If homesites are needed, the record shows thousands of vacant lots in and adjacent to Garden City more suitable for residences.

Those just sold for $85 and $100 each are further removed from industry. Location alone makes the value of these twenty acres for residential purposes nominal compared to their value for their present use.

The case of *Best & Co.* v. *Incorporated Village of Garden City* (247 App. Div. 893) and the other cases cited by the defendant, were where variances were sought of zoning law provisions in effect prior to the proposed nonconforming use.

The defendant properly points out that a review of such a decision of the zoning board should be by certiorari.

Plaintiff here is not seeking a review of any decision of the zoning board. It contends:

(1) that this plant and property are devoted to a nonconforming pre-existing legal use and the zoning ordinance is void and ineffectual to prevent said use; and

(2) that the zoning ordinance insofar as it restricts the property to uses permitted by the ordinance in a " B " residence district, is so unreasonable and confiscatory as to result in an unconstitutional taking of the property.

It is well settled that a pre-existing use cannot be disturbed by a zoning ordinance. (*People ex rel. Ortenberg* v. *Bales,* 224 App. Div. 87, affd. 250 N. Y. 598; *Village of Mill Neck* v. *Nolan,* 233 App. Div. 248, affd. 259 N. Y. 596.)

The right to apply for a variance of a zoning ordinance or to review a determination of a zoning board by certiorari does not deprive an owner of a cause of action attacking the validity of the zoning ordinance itself. (*Euclid* v. *Ambler Co.,* 272 U. S. 365, 396 [1926]; *Dowsey* v. *Village of Kensington,* 257 N. Y. 221, 228 [1931]; *Ulmer Park Realty Co.* v. *City of New York,* 267 App. Div. 291 [1943].)

Curtiss-Wright made this big investment in a new industry by buying land and erecting the plant within the covenants contained in the deed from its grantor prior to the incorporation of the Village of Garden City, and started operations several years before the adoption of any zoning law.

Therefore, if the closing down of actual manufacturing from 1932 to 1940 was not an abandonment of the nonconforming use, the plaintiff's first contention must be sustained.

The court finds that the shut-down after more than twelve years' active operation, ten of which were after the adoption of the first zoning ordinance putting this property in a residential zone, was due to economic reasons, the long-continued depression.

Employees and records were always at the plant. Parts of it were rented to produce income, thus continuing a pre-existing nonconforming use permitted by the restrictive covenant in the deed from the grantor, Garden City Company. Curtiss-Wright did nothing indicating an intention of giving up the nonconforming use or of devoting this property to residential purposes. The fact that machines were moved or sold off years after their original installation might indicate that when business revived, more modern machines would be required for great progress was being made in the design and construction of airplanes and appliances for safety in flying, and machinery for their making. Much of this progress came in the last five years under the stress of the war in which our country has served as " The Arsenal of Democracy ".

As to plaintiff's second contention that the ordinance restricting this property to a " B " residence use, is so unreasonable and confiscatory as to result in an unconstitutional taking of the property.

The court finds that the entire value of the buildings would be destroyed and that the value of the land would be more than offset by the cost of demolishing the buildings and of making the improvements to the land to fit it for residential use, for which it is not now and will not in the now foreseeable future, be adapted.

In *Dowsey* v. *Village of Kensington* (257 N. Y. 221, 228, 231, *supra*) the court said: " Certainly an ordinance is unreasonable which restricts property on the boundary of the village to a use for which the property is not adapted, and thereby destroys the greater part of its value in order that the beauty of the village as a whole may be enhanced."

In *People ex rel. Arverne Bay Constr. Co.* v. *Murdock* (247 App. Div. 889, affd. 271 N. Y. 631) an owner of vacant land on Linden Boulevard in Brooklyn, sought a permit for a gas station. The site was in an unrestricted zone until 1928 when it was placed in a residential zone.

Plaintiff's application for a variance on the ground of unnecessary hardship was denied by the Board of Standards and Appeals, which determination was sustained by the courts. Thereupon, the same owner sought an adjudication that a zoning ordinance restricting its property to a residence use constituted a taking without due process of law. (*Arverne Bay Construction Co.* v. *Thatcher*, 278 N. Y. 222.)

The court held that the zoning ordinance restricting this vacant parcel to a residence district was unreasonable and constituted a taking. Our Court of Appeals said, pages 230–231: " We may assume that the zoning ordinance is the product of far-sighted planning calculated to promote the general welfare of the city at some future time. If the State or the city, acting by delegation from the State, had plenary power to pass laws calculated to promote the general welfare, then the validity of the ordinance might be sustained; for ' we have nothing to do with the question of the wisdom or good policy of municipal ordinances.' (*Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 393.) The legislative power of the State is, however, not plenary, but is limited by the Constitution of the United States and by the Constitution of the State. It may not take private property without compensation even for a public purpose and to advance the general welfare. (*Matter of Eaton* v. *Sweeny*, 257 N. Y. 176.) ' The protection of private property in the fifth amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the fourteenth amendment. *Hairston* v. *Danville & Western Ry. Co.*, 208 U. S. 598, 605.' "

Our Court of Appeals then quotes from a decision of the late Justice HOLMES of the United States Supreme Court (*Penna. Coal Co.* v. *Mahon*, 260 U. S. 393, 415): " When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualifications more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States."

Continuing, our Court of Appeals said, at page 232: " An ordinance which *permanently* so restricts the use of property

that it cannot be used for any reasonable purpose goes, it is, plain, beyond regulation, and must be recognized as a taking of the property. The only substantial difference, in such case, between restriction and actual taking, is that the restriction leaves the owner subject to the burden of payment of taxation, while outright confiscation would relieve him of that burden.''

The *Arverne Bay Construction* case (*supra*) referred to, dealt with an owner who had a vacant plot assessed at $18,000, for which he sought a variance for a nonconforming use — a permit to allow him to erect a gasoline station in a residence zone.

In the *Curtiss-Wright* case here under consideration, we have an owner who purchased land and, at great cost, improved it as permitted by the restrictive covenants in his deed before the village was incorporated or the zoning laws were enacted — a much stronger case for a court of equity.

The court sustains plaintiff's contention that the ordinance seeks to limit use of the property to a use which is unreasonable and confiscatory.

Judgment for plaintiff on both causes of action.