Nathan D. Lapham, Off. Ref.
This controversy revolves around the application of Mr. and Mrs. Crone for a permit to build and operate a gasoline service station on their property, Lot 1, Block B of the Roselawn subdivision at the easterly corner of Monroe Avenue and South St. Regis Drive in the Town of Brighton, Monroe County, New York.
The above-entitled action and the proceeding were instituted simultaneously. By the former, the plaintiffs claim that the Zoning Ordinance of the Town of Brighton is invalid and unconstitutional as to the particular parcel of property here involved in that it prevents them from putting it to any practical and reasonable use, and therefore deprives them of the benefits of ownership; seek to have the Zoning Ordinance of the town declared invalid and unconstitutional as to the subject property; and for a mandatory injunction to issue the permit. A second cause of action alleging that the Zoning Ordinance is generally invalid was withdrawn by stipulation.
The same parties instituted the proceeding by which they assume the validity of the Zoning Ordinance and seek a review of the action of the Planning Board and Board of Appeals of the town with respect to the application for a variance on the ground the ordinance imposes unnecessary hardship and practical difficulties; and to obtain a temporary permit, or a variance of the Zoning Ordinance to permit the erection of a gasoline service station on Lot 1.
Counsel for litigants stipulated that the action and proceeding be tried together and that any evidence offered in one shall be considered in the other.
*1025 By order dated July 2, 1952, on stipulation of attorneys, Mr. Justice Roberts referred the action and proceeding to me as Official Referee to try and determine with “ full power and authority to direct judgment and/or make such determination in the action and proceeding as I may deem just and proper, with the same force and effect as if made by the Special Term or by the Equity Term The trial and hearing occupied six days between August 11 and 26, and the issues were finally submitted on December 18, 1952.
The Town of Brighton has practically no industrialization. It is a township of above average homes with limited commercial areas to serve the residents.
About 1925 the town adopted a Zoning Ordinance, subsequently amended. It zoned as commercial a 150-foot strip on either side of Monroe Avenue between the city line and the Town of Pittsford, and requires a 60-foot front setback for all commercial structures. A motor vehicle supply station is not included in the permitted commercial uses but, by section 16 of the Zoning Ordinance of February 1, 1933, as amended, it is provided that: “ The Planning Board may with the approval of the Town Board on special application issue a temporary permit for a term not to exceed five years for the operation of * * * a motor vehicle supply station in a commercial district. The Board may require the applicant to submit to such examination and furnish such information as it may require before acting thereon, and fix the location of structures on the premises in its discretion. The determination of the Board may be reviewed by the Town Board in the first instance without appeal to the Planning Board sitting as a Board of Appeals. No motor vehicle supply station shall have an entrance or exit within three hundred (300) feet measured within street or alley lines, of the entrance or exit of an existing school, playground, * * * church
Section 50 provides: ‘‘ The Planning Board and the members thereof are hereby vested with the powers and duties of the Board of Appeals as set forth in Chapter 634 of the Laws of 1932, Article 16, Section 267. Said planning Board may by virtue of the authority in this Section to it granted, revoke any permit issued by its authorized agent upon the concurring vote of four (4) members of the said Board. All rights and powers including but not limited to the right of appeal and the right of review by certiorari as set forth in the above sections are hereby conferred and granted to any person or persons, officer, department, board or bureau of the Town jointly or severally aggrieved by any decision of the Town Board, Planning Board, *1026 or any of the officers, employees or subdivision of the said Boards.”
Lot 1 is a corner plot, irregular in shape, 112 feet on the north or Monroe Avenue front, 103 feet on the west or South St. Begis front, 34 feet on the south and 62 feet on the east, subject to setbacks of 60 feet on Monroe, 14 feet on South St. Begis, and 10 feet on the east and south, leaving a usable area within the setback lines of about 4,500 square feet, which is further reduced by some 313 square feet because it is impractical to build in the extreme apex angle.
Early in 1951, the Socony Vacuum Oil Company, Inc. became a prospective lessee of this lot, provided a permit to build and operate a gasoline service station could be obtained.
The Crones applied for such a permit at the September 4, 1951, meeting of the Planning Board of the town. The minutes of that body indicate the matter was discussed and held for further study and consideration at that time and at four subsequent monthly meetings. In the meantime, on notice to all residents within 500 feet of the proposed station, a public hearing was held at the December 5 meeting and decision reserved. Finally at the meeting of the Planning Board Zoning and Building Commission February 1, 1952, by unanimous action, a temporary permit was granted on certain conditions and specifying that ‘ ‘ Under Section 16 of the Zoning Ordinances, the above permit must also be approved by the Town Board.” On March 3 following, the Town Clerk wrote to the Brighton Planning, Building and Zoning Commission stating that seven residents representing six properties appeared at the regular meeting of the Town Board on February 13 and voiced their protests, and that a number of residents attended the regular Town Board meeting on February 28, and through Mr. Giitelman, an attorney, filed a survey of the area and stated their opposition orally and by a letter petition, stressing the 300-foot prohibition of such a station to a playground or church entrance. This letter of the Clerk stated it was moved and seconded “ that the petition and communication from Jacob Giitelman with map attached thereto be received and filed; petition to be referred to the Brighton Planning, Building and Zoning Commission for study and recommendation to the Town Board.” At its March 4 meeting this commission reconsidered the matter, rescinded and revoked its approval of the issuance of a temporary permit, and denied the Crone application. They had a right to reconsider. The Crones had no vested rights. The permit was conditional on approval by the Town Board. *1027 (Matter of Ambrosio v. Zoning Board of Appeals, 196 Misc. 1005,1009.)
The applicants had not been informed by the town authorities of a change in the form of a gate, or of further objections being lodged with the boards. The defendants-respondents take the position that this was unnecessary as the application was still in the consideration stage and no permit existed until approved by the Town Board. This is technically true, but the Crones might have wished to be heard further on the gate which had appeared on the property of the Centenary Methodist Church opposite Lot 1 sometime between the February 1 decision and February 26, and which made the 300-foot prohibition pertinent. A trustee of the church at the December 4 hearing had called attention to the existence of the rear door, inquired if it had been considered in measuring the distance and had been advised it would be checked, but at that time it was completely shut off from Monroe Avenue by the fence. On December 10, Mr. Crone addressed a letter to the Town Building Inspector stating that he knew “ for a positive fact that ever since this church was built, about 25 years, the door on the north side of the building has never been used as an exit ”. It is noteworthy that section 16 uses the words “entrance” or “exit” implying use to which this door was not susceptible from Monroe Avenue because of the fence.
For some reason the Crones by-passed the Town Board before which they were entitled to a review of the denial, and on July 2, 1952, their attorney joined the Town Attorney in stipulating that the determination of the Planning Board and the Building Commission shall be deemed to have been made pursuant to due appeal to the Planning Board sitting and acting as the Board of Appeals and a determination and rejection by said Board of Appeals on a duly called hearing in accordance with legal procedure, excepting that respondents are not to be prejudiced by the absence of findings of fact or statement of reasons for the determination. This stipulation seems to have been in accordance with the understanding of the parties throughout the period, as evidenced by the legal notice of the public hearing to be “ held by the Planning Board and Board of Appeals of the Town.” But this stipulation is directed to procedure and cannot be interpreted as an acquiescence by the Crones in the action of the boards, either as to decision or failure to notify of reopening.
Plaintiff s-petitioners ’ brief stressed their request for a variance of the Zoning Ordinance. Defendants-respondents *1028 challenge this as an afterthought claiming the Crones went before the Planning Board on a special application for a temporary permit under section 16 of the ordinance; that they sought no variance by way of questioning the validity of the ordinance, as to setback or size of proposed structure, or from the 300-foot prohibition which had not then become an issue; and, therefore, that there was no logical reason for any evidence on asserted hardship and practical difficulties. Plaintiffs-petitioners have no quarrel as to the section. While they did not initiate their application by a written request specifying the section under which they were moving, in a memorandum submitted in the early stages and in their brief, they state they were proceeding under section 16, taking the position that the Planning Board may issue a temporary permit even when no hardship is shown, but that in their case the unique inadaptability of the lot to a conforming use presents practical difficulties and unnecessary hardships entitling them to a variance. According to the minutes of the Planning Board, on his first appearance Mr. Crone stated the limitation of use imposed on this lot by the Zoning Ordinance. By his questioning at the public hearing, his attorney pursued the subject and in the memorandum stressed practical difficulties and unnecessary hardship. Indeed, the Town Attorney, who joined in the stipulation, in his brief pointed out that a matter does not come before the Board of Appeals except on an appeal or on an application for a variance. Obviously, at the time of the. notice of the public hearing to be “ held by the Planning Board and Board of Appeals ” there was no appeal pending because no decision had been rendered. I am convinced the request for a variance was not a new approach first injected by the complaint and petition before the Supreme Court in March of 1952, but, rather, that it was sought from the beginning and that the town authorities were cognizant of that fact during their deliberations. They knew such a use was not included in conforming commercial uses. “ The purpose of a variance is to afford a safety valve, so that the carrying out of the strict letter of the Zoning Ordinance may not occasion unnecessary hardship to particular property owners.” (Bazinsky v. Kesbec, Inc., 259 App. Div. 467, 472; Yokley, Zoning Law and Practice [1st ed.], § 120, p. 227.)
The determination of the issue here involves the character and complexion of Monroe Avenue from the city line easterly, and more particularly the five or six blocks between the city line and the Twelve Corners formed by the intersection of Monroe and Elmwood Avenues and Winton Road. Lot 1 is *1029 about midway in this stretch. Monroe Avenue angles to the southeast but, for convenience, it is treated as running east and west.
"When the Roselawn tract was opened, the deeds contained a provision restricting the use of the land to residential purposes for a certain number of years but this restriction expired in 1934.
There was much testimony as to the character and uses of the individual properties. From the record, it is clear that in 1929, when the Crones purchased and moved into their home at No. 1627 Monroe Avenue adjoining on the east Lot 1 which they later acquired, there were private homes on the south side of the avenue from the city line to Glen Ellyn Way, interrupted only by four vacant corner lots, including the subject property. To the east there was nothing except an Amoco gasoline station, one building occupied by the town offices and a grocery store, with a baseball field in the open space between the present town offices and the old Sheehan farm, now occupied by a Howard Johnson Restaurant. On the north side of the avenue at that time the land was vacant from the city line to the church on the corner of North St. Regis, with the exception of the old Chilson block at Warrington which later burned. Between the church and the Chateau, a hotel and night club on the northwest corner of Monroe and Winton Road, there were eight existing residences, two under construction and 14 vacant lots.
However, about 1929 three fine apartment buildings were erected on the north side just east of the city line and shortly later the original shopping center in this area and adjacent stores and apartments. Sometime between 1930 and 1942, there was great commercial activity around the Twelve Corners. A Howard Johnson Restaurant sprang up on the Sheehan farm with a shopping center to the west, and across Monroe between Winton and Elmwood a large shopping center developed with a Wegman store as the focal point. The commercial life of the neighborhood was accelerated. On the south new enterprises came in, and established businesses modernized their plants to the extent that, with the construction of a block of stores on the southwest corner of Glen Ellyn and Monroe three years ago the stretch from that point to the Twelve Corners became 100 per cent commercial on the south side of the avenue.
The development on the north side has been less spectacular and more spotty, but with the New Loblaws on the west, the large, active shopping center on the east, and the few old residences between used in connection with, or hemmed in by, commercial enterprises, it is most likely that the six vacant lots in this immediate area will be developed commercially and that *1030 the north side of the avenue will follow the south into the 100 per cent commercial class. Indeed, it is so considered now. In this section only one residence has been built since 1940 and it stands out as an exception to the neighborhood pattern.
Immediately to the west of Glen Ellyn intersection, there are 19 houses on the south, broken only by three vacant corner lots, and 10 houses and three large apartment buildings on the north, punctuated by limited commercial uses, vacant lots, the church and the shopping district where Oakdale and Warrington Drive join Monroe. In this area is the subject property and the real divergence of opinion centers around this stretch west of Glen Ellyn.
There was much testimony as to the trend of commercial development along the avenue in an effort to prognosticate the outlook in the vicinity of Lot 1. Mrs. Crone testified that in 1929 they displayed a 1 ‘ Crone Realty Company ’ ’ sign on their home property — the first sign in the neighborhood to proclaim a home was being used for an incidental commercial purpose. This was followed by tourist signs with no protest until sometime around 1936 a baby food concern manufacturing their products in the basement of No. 1649 installed an illuminated sign which prompted neighborhood objection. Then other residential properties were put to a limited commercial use by a dentist, a hairdresser, a printer, real estate broker and as tourist homes. True some have abandoned the incidental use but the practice has increased until now we have two doctors, two dentists, an optometrist, a third realtor, a music studio, a plumber, a motel, and one house used as a beauty shop, barber shop and tourist home with a crushed stone parking area in front for customers and guests. Soon after the Crones moved there, the vacant land on the north side west of Oakdale was developed as a shopping center and stores and apartments with, as I understand the record, another commercial building connecting the two erected about 1942.
The Crones urge these changes as evidence of rapidly creeping commercialization of the whole area. It is true, as Mr. Crone admitted, that new homes have been erected since 1942 around the westerly corner of Monroe and North St. Regis, and at least one, No. 43, on South St. Regis. But one faces on Monroe and, as I scale the map, the major portion of the lots of the two on North St. Regis is within the 150-foot strip, and it would appear a small part of the lot of No. 43 falls in this zone. In any event they were built hard by a zone long since designated and partially developed as commercial, so that the owners must be deemed to have accepted the risk. Mr. Greeno, who formerly *1031 lived in the Town of Brighton a few blocks from Lot 1 and who is engaged in the real estate and insurance business, sworn on behalf of plaintiffs-petitioners, expressed the opinion that the trend of commercial development is westward from Glen Ellyn and that business will probably supersede residences in this area “ultimately” — within the next 20 years. He admitted the immediate future will see the commercial development of vacant properties before resort is had to improved land but stated that, as the houses become older, they will depreciate as residences and be absorbed for commercial purposes. Mr. Borchard, a real estate broker, called as an expert by the Crones, pointed out that the commercialization of Monroe started with the original shopping center on the north side west of the subject property, that the last commercial structure to be erected on the avenue was at the east end of the very block in which Lot 1 is situate, and expressed the opinion that the trend of future commercial growth is westerly, and that “ This area will be filled up with small type of store and business structures ”, when he did not state.
As against this, the defendants-respondents hold that the trend is to the east. The chairman of the Board of Assessors of the town expressed the opinion that the present commercial development is eastward from Lot 1. Mr. Shirley, a defendant in the action, has been an official of the town in various capacities since 1937, and is presently serving as Building Inspector. He frankly testified he could not say the section between Lot 1 and the commercial area to the east would not change from residential to commercial but he emphasized the fine homes at the west end, characterized the neighborhood as predominantly residential in that particular area and concurred that the trend of commercial development is to the east of the Crone holdings. The town’s expert, Mr. Perkins, a real estate and mortgage broker and appraiser, said that after the original shopping center opened at Warrington, commercial growth jumped eastward to the Twelve Corners and worked back west to, and including, the west corners of Glen Ellyn where there is a break beyond which shoppers parked at the centers are unwilling to walk, and that there we find buffer property which cushions the change from commercial to residential. He also says there is another break between the two types of use just east of Warring-ton, buffered by a vacant lot, and expressed the opinion that neighborhood resistance made the commercial development of vacant lots in this immediate area improbable, citing the plumbing concern that withdrew its application to build on the two lots opposite the subject property and went elsewhere. In his *1032 opinion there will he no change in neighborhood character in the area west of Glen Ellyn for 25 or 30 years. But it cannot be overlooked that these two stops or breaks are of very recent origin and, with five vacant lots on the north side sprinkled between, it appears highly speculative to maintain commercial advance will long be stemmed throughout this strip which was designed to serve the needs of large and ever-growing residential areas to the north and south, especially so since the commercial districts of this town of homes is very limited and Monroe Avenue is the only commercial zone in that section of the town. The Town Board, in its letter transmitting the petition to the Planning Board, stated that it called the attention of objectors “ to the fact that the character of Monroe Avenue has changed considerably within the past few years ”. In support of his claim of an eastward trend, Mr. Perkins stressed that there is considerable undeveloped land east of the Twelve Corners, that the houses there are much lower in grade and cost, that there is a railroad available on the north with siding privileges, and cited the rapid and active development in that region accomplished and contemplated. As against this, he said to the west of Glen Ellyn there were substantial homes on small lots, which would make the cost of conversion more expensive. This is true and the Referee is convinced Mr. Perkins is correct in his analysis and prognosis of the development east of the Twelve Corners, but that section appears to be attracting a different type of business, and its growth does not necessarily rule out activity by smaller concerns to the west, especially on vacant lots, and this would be enough to destroy what residential atmosphere now exists.
According to an uncontroverted statement in the memorandum submitted in behalf of the Crones, a survey of the residents within a 400-foot radius of Lot 1 indicates that only about six families now owning homes lived here prior to 1935. This indicates that the owners who acquired their homes in a residential area, reading the handwriting on the wall, disposed of their property to others who were willing to buy in a commercial zone. Presumably the owner who acquired a parcel “ with notice of the zoning resolution, paid a consideration appropriate to the limitation of the use. There is no element of the unexpected or the incalculable to aggravate his plight ’ ’. (People ex rel. Fordham Manor Ref. Church v. Walsh, 244 N. Y. 280, 288; Matter of Aberdeen Garage v. Murdock, 257 App. Div. 645; Matter of Thomas v. Board of Stds. & Appeals of City of N. Y., 290 N. Y. 109, 115; People ex rel. Polcini v. Scofield, 279 App. Div. 762.) At the December 4 hearing, *1033 Mr. Greeno, testifying in behalf of the Crones, said that the houses listed for sale at that time along the avenue were offered on a commercial basis, although the examples cited, other than No. 1663 (the barber and beauty shop) appear to be much farther to the east.
However, there is not a scintilla of evidence that a gasoline service station on this lot would be detrimental to the commercial development to which this strip is dedicated. Mr. Borchard said he believes it would be advantageous. We know there are several such stations in the 100 per cent portion of the avenue to the east and no claim they have deterred or damaged the surrounding commercial properties. Indeed, there is evidence that two houses were built on Hollywood Avenue immediately south of an existing Amoco station.
We are not dealing here with an area purely residential in use, tightly sealed off from the commercial district by buffer property, but the whole avenue from Glen Ellyn to the city line is perforated with homes used for incidental purposes from professional offices to a motel and a beauty and barbershop. The latter is only five properties removed from Lot 1 and presents a picture in which the commercial overshadows the residential. The expert for defendants-respondents pointed out that, before zoning, very expensive homes were built in the three blocks along the south side of the avenue from the city line to Glen Ellyn Way and, although the zoning definitely stopped construction of this type of home here, he characterized this stretch as high-class residential today. At the same time he classified at least two of these same blocks between Sylvan and Glen Ellyn as limited-commercial, fringe-residential which, like property in an abutting fringe section, has a lower desirability and marketability than in a strictly residential zone. While the homes are attractive and well cared for, it impresses the Referee that the high-class residential atmosphere of the past has gradually bowed, perhaps reluctantly but certainly, to the commercial purpose for which the town set this strip apart. The limited commercial uses now made of many of these homes is a definite step toward commercialization, and a step taken by the owners. Lay witnesses and experts, given the same set of facts, differ in their interpretation as to the future of this section. Human prophecy is subject to man’s fallibility and many variables, and therefore uncertain. The real estate field is no exception, but I think no one claims that with the passage of time, the strip will not be completely commercialized, although there is disagreement as to when that will take place.
*1034 Closely allied to the pattern of development are possible uses and marketability. No one questions that by size, location on an arterial highway and frontage on two streets, Lot 1, in and of itself, is well fitted for development as a motor supply .station, but defendants-respondents seriously challenge the suitability of such a use in that particular neighborhood.
Mr. Crone detailed his unsuccessful efforts to dispose of this property as evidence of its peculiar character and of inability to put it to a conforming use. He testified that some four years or more before the trial and hearing before me he listed the three properties together with the Eochester Beal Estate Board at a price of $40,000, erected a large “ For Sale ” sign on the front of the property and advertised it extensively in the daily press until about a year ago. He said his only attempts to sell Lot 1 alone were when prospective purchasers expressed disinterest in the group and he talked to them about the corner lot. He listed as “ a few ” of the prospects for this lot seven concerns interested in a place of business for sales and display, a contractor contemplating the erection of a doctors’ office building, a church group and the director of a funeral home, and testified that five stated there was not sufficient room on the lot, that, after he disclosed the dimensions, he heard nothing further from four others, and that in the ease of the funeral home it was prohibited by the Zoning Ordinance; that a dairy concern dropped out of the picture after consulting the Planning Board, their standard structure not measuring up to the square footage requirement in force, and that in no instance did the negotiations reach the stage of discussion of price. Mr. Crone’s failure to list or advertise Lot 1 separately seems the more surprising in view of the fact that the area embraced in the three may have exceeded the needs of many potential users, and particularly because the existence of a substantial dwelling on the home lot placed the group in a price range many may have considered prohibitive. However, the list of prospects enumerated is sufficient to show he encountered great difficulty. He testified that he never received an offer at any time or at any price for Lot 1 for residential or commercial purposes, or for Lots 1 and 20, or 1 and 2% (home), or all three.
His expert, Mr. Borchard, outlined certain uses which the size of the lot would accommodate, including a residence, but ruled them out as requiring a building below zoning rules (White Tower Bestaurant, Dairy Bar), or on the ground of undesirability of the site for the purpose (drugstore or residence), or that the income would not justify construction costs or make the venture feasible mortgagewise (commercial), and *1035 expressed the opinion, that there is no practical use for this lot other than a gasoline service station for which he says it is well adapted. Mr. Greeno testified that, in his judgment, the lot is practically unmarketable for residential purposes because it is in a commercial zone on an arterial highway, and there are other available lots in nearby areas north and south of the avenue not subject to these handicaps. Both these witnesses take the position that the marketability of the residential properties in this neighborhood was adversely affected when the avenue was strip-zoned commercial, and by their frontage on, or near to, an arterial highway, and that a gasoline service station on Lot 1 would not cause further damage in this respect, other than to the Crone home, and Mr. Borchard maintains that it would not suffer if sold for a commercial use, that a station here would tend to increase the value of other properties for commercial purposes, and would not be as objectionable as certain conforming uses. He also expressed the opinion that such a station would not harm the houses on either side of South St. Regis as to mortgageability or marketability because Mr. Crone owns the vacant lot adjoining on the south and all are insulated by a distance of at least 120 feet. Of this I am not convinced. It seems unreasonable to believe that owners in a residential area, who cannot anoint their present discomfort by hope of future reward through sale at commercial values, would not suffer loss by the operation of such a station. Mr. Perkins’ testimony that homes in an abutting fringe district, or in a limited-commercial, fringe-residential area are less desirable and less valuable than in a strictly residential zone sounds in logic. No law or ordinance can preserve everyone unharmed and owners of property abutting on a commercial area live under a perpetual threat.
Defendants-respondents point to the comparatively new homes on the west side of North and South St. Regis, to a residence just across the street from Lot 1 used incidentally by a physician, and, through their expert, Mr. Perkins, claim that this site would be most desirable for a residence of a doctor, dentist, professional or business man who wished to use his home incidentally as his office, or that it would even be suitable for a strictly residential use provided the lots on the north side of Monroe are not developed commercially. In the face of so great a risk and so strong a probability of commercial use of these vacant lots, I believe a purely residential use of Lot 1 must be completely discounted. On cross-examination, this witness admitted with commendable candor, that the uses to which Lot 1 and the three vacant lots on the opposite side of the *1036 avenue in this immediate vicinity were put would have a reciprocal effect; and that, in his opinion, the only use for vacant lots facing on the avenue between Glen Ellyn and Sylvan Road is as combination residential plus commercial or exclusively commercial; that he knows of no structure built in this stretch for a combined residential-commercial purpose although several existing homes have been purchased in the last 20 years for such a dual use; and that a builder of such a structure on the subject property, with the lots across the street open to development, would be proceeding at a financial risk. He also testified he did not place much emphasis on the commercial value of Lot 1 unless it were used for some unique enterprise that would lend itself to the neighborhood architecturally and not stir resistance. He said a commercial structure suitable to the surroundings with apartments above and offices or one or two stores below could be put up there and be economically feasible, but the stores would have to be specialty shops not found in nearby shopping centers which would draw customers to them, such as, for example, a high-grade ladies apparel or millinery store, a photographic studio or tea room. However, he said any loan on a highly specialized store was a ‘ ‘ venture loan ’ ’ which the organizations he represented would not touch unless the project had “ a neighborhood general acceptance ”, or the proposed tenant was so financially strong as to eliminate the danger of having to take the property back. In fairness we must recognize there is no commercial development opposite this plot to attract persons to the area as is the case of the stores at the east end of the block on a similarly shaped but larger site which is advantaged by the drawing power of Loblaws directly across the avenue. (People ex rel. St. Albans-Springfield Corp. v. Connell, 257 N. Y. 73.)
Mr. Perkins, speaking from his experience as a real estate and mortgage broker and as an appraiser, concurred that the value of residential properties along the avenue was adversely affected to some extent by the strip-zoning, but he claims a service station in a residential area causes sales resistance and thus further reduces mortgageability and marketability within a radius of 400 feet, and beyond, where there is an outlook on the station. He placed the deterioration in value that would result from a service station on Lot 1 as ranging from 35% on the Crone home, one third for the houses directly across on South St. Regis, one fourth on the north side of the wider and more heavily travelled Monroe Avenue, and on a diminishing scale to the east and west, as well as houses more distant where the present outlook would be marred. The chairman of the *1037 Board of Assessors of the town, who has served with that body for over 12 years, testified that, in his opinion, such a service station would deteriorate the value of properties within a certain radius, and that the board followed the practice of placing lower assessment valuations on properties so located. He granted a commercial structure would have an adverse effect, but not to the extent of a service station.
The wide divergence of opinion on marketability and values stems from a difference in emphasis. The plaintiff s-petitioners urge that commercial development in this commercially zoned strip will increase the commercial value of all properties, and that the advance of commerce westward is heralded by the development around Warrington and Oakdale, by limited commercial use of many homes, by the practical cessation of residential building on the avenue and by vacant lots which are attracting commercial prospects who cannot he denied if they submit well-designed plans for enterprises that are not obnoxious. The defendants-respondents take the position that, even though the land is zoned commercial, this particular stretch of the avenue is residential in character, the lots are too small and the homes too expensive to encourage buying for commercial uses now or in the near future, that the commercial trend is eastward into an undeveloped and less expensive area and, therefore, that, in spite of incidental uses and encroaching commercialization, the main value of these properties remains residential. In other words the plaintiffs-petitioners urge the advantage of development in keeping with the use for which the zone is zoned, and the defendants-respondents claim the residential character is so strong that commerce should be held back and denied for an indefinite time.
Let us turn our attention now more directly to Lot 1, the proposed development and its impact on the neighborhood. The Crones had been familiar with this plot adjoining their home for many years. He testified that in 1933, acting as a broker for the then owner, he attempted unsuccessfully to sell it for a miniature golf course for $12,000. In 1943 Mr. Crone purchased the lot from the county, which had acquired it through foreclosure, at a cost to him of $720 and has since paid assessments of about $900. He never disclosed the price at which he has been holding it, simply stating that negotiations had never progressed to the question of cost. Mr. Perkins placed its present value at between $5,000 and $6,000. Mr. Crone assigned various reasons for the purchase. The purchase offer or contract which he signed specified “No building required, as my home is situate on Lot 2%, Block B, and abuts lot 1, block B *1038 which I desire to acquire to improve my property(Italics supplied.) The memorandum submitted by his attorney states it was purchased “ for possible development as a residential site ”, and before me, Mr. Crone testified that, believing in the future development of Monroe Avenue as the only thoroughfare in the town that could be used for commercial purposes, he bought this plot for the benefit of his son, for investment purposes. He stated he did not know the county would not sell for investment purposes, but was familiar with its policy of fostering revenues by requiring the purchaser of a foreclosed lot to agree to build upon it in a specified time and of withholding the deed until the structure was partially completed, with the exception that where a property owner buys adjoining county owned land for the purpose of adding it to his own, the building requirement is ordinarily not enforced. Of course, the purpose set forth in the purchase offer is contrary to the other motives later advanced, and, when confronted with the contract, Mr. Crone denied he had so informed the county and at first challenged the contract by stating “ That’s not written at the same time the other was written ”, later modifying his testimony by saying that he did not recall it but did not deny it might have .been there. He did not stand in the position of a layman relying wholly on others to implement his purchase. He was a real estate man and, as such, should have been familiar with the Rochester real estate picture, especially in the section where he had lived so long, and with the meaning and importance of contracts. His shifting and evasive answers are pertinent in weighing the honesty and credibility of his testimony. However, his deed embodied no restrictions and his purpose in purchasing is now academic because there is no dispute that in 1943 the present practice of welding a newly acquired property to a previous adjoining holding by means of a resubdivision map was not mandatory, and the town does not now contest Mr. Crone’s right to build on Lot 1 within the Zoning Ordinance. This litigation centers about the character of structure to be permitted.
After his son’s death, about 1947 Mr. Crone bought vacant lot No. 20 facing on South St. Regis and joining Lot 1 by a narrow neck and his home property on the south. He said he paid $1,350 or $1,450 to the county which had acquired title through foreclosure and that he made this purchase with the thought the three parcels could be used as a unit if a purchaser .wanted more land, although he told the Planning Board he had no intention of razing or abandoning his residence.
*1039 It is apparent there is a strong feeling in the neighborhood that to permit a gas station, admittedly outside the recognized conforming uses, would be to add insult to the injury sustained by owners of residential properties when the strip was zoned commercial. This leads us to look closely at just what is proposed for Lot 1. The representative of the Socony Vacuum Oil Company, in charge of procuring station sites in the Rochester district, testified his company is desirous of building their standard modern station of masonry construction with white enamel front and sides striped in red. He described in detail the layout with salesroom, lubratory, storage and rest rooms, underground storage tanks for gasoline, another for used oil, two lighted pump islands, four floodlight poles with T arms at strategic points around the lot the surface of which is to be paved, aE in accordance with the plans and specifications submitted to the Planning Board. He claimed there would be an easy flow of traffic through this station; an absence of traffic or explosive hazards; that the comparatively small building would not obstruct the vi&w; that order and cleanHness is a company policy for its stations; that aE service and tire changes would be done inside with quiet modern equipment; that the only times fumes would be expelled would be for about 25 minutes three times a month when the tanks were filled, and this from vents 14 feet above the surface; and that the fighting of the station and lot was designed to center on the area and not spiE over onto adjoining property. There is no dispute that the plans submitted indicate a well-planned modern station, but I think that even its most ardent advocate wifi not dispute that such a station is designed to attract the eye and, if erected, would stand as a gleaming white landmark.
However, the Crones would be permitted to erect a commercial structure of a design and for a use that would meet the approval of the Planning Board, and it is pertinent to inquire in what way the proposed gasoHne station would be more distasteful than a commercial structure. I do not perceive that the traffic hazard would be any greater in the case of such a station than, a well-patronized business enterprise. Nor do I believe the fumes or noise from the station would be apparent above the traffic conditions on this heavily travelléd thoroughfare. Modern stations, such as proposed here, are designed for safety and the success of this purpose is indicated by the fact that the fire and explosion insurance rates on adjoining residences is the same as on homes not so situated. Plaintiffs-petitioners urge that the proposed station would be more desirable than many commercial establishments which are given *1040 to setting refuse and discarded materials outside the rear of the store, thus creating an untidy appearance and issuing an invitation to flies and insects, and point out that the station makes provision to keep all waste substances under cover and out of sight. This argument is not without merit. I am not forgetting that, while the practice is not limited to service stations, they, more than other businesses operate at night and on Sundays. But the main objection in this area appears to me to be aesthetic. I do not think it can be gainsaid that this gleaming enamel station with lighted islands would stand out very conspicuously, particularly when flood-lighted as it would be at night and for long periods in the short days of Winter. By no stretch of the imagination would it blend gracefully into the picture and it would be more obtrusive than the present unkept condition of Lot 1, but it cannot be urged that it would be detrimental to public health, safety or morals, or even the general welfare except as it jarred upon the eye. And it is only realistic to recognize that there are conforming commercial uses which might build a structure that would stand out with like boldness. There is evidence a Dairy Bar was excluded, and a White Tower restaurant would be, because their standard buildings do not meet requirements as to size, but the possibility is not remote that such a concern might seek and obtain a variance as to size, or that a similar enterprise might qualify. Be that as it may, the vogue of modern commercial buildings for bright, eye-catching structures set off by the brilliance of neon lighting, and the inevitable congestion of motor vehicles parked in front, makes it impossible for me to perceive how the proposed station would have any greater impact than many conforming uses. In any event, while aesthetic grounds are not to be completely disregarded, they are not enough to warrant a denial. (Matter of Holy Sepulchre Cemetery v. Board of Appeals, 271 App. Div. 33, 43; Dowsey v. Village of Kensington, 257 N. Y. 221, 230.)
Mr. Crone urges his unsuccessful efforts to dispose of Lot 1 in support of his claim of practical difficulties and unnecessary hardship, and asserts a gasoline service station is the only practical use. Defendants-respondents, through their expert, advanced other conforming uses but Mr. Perkins’ testimony that the possibility of commercial development is limited to unique, specialized businesses which represent a “ venture loan ”, that all arterial highways tend to lead to commercialization, that residential-incidental commercial use is an admitted risk, and practically ruling out a strictly residential use as *1041 too hazardous to be contemplated, offers but weak opposition, if any.
It is argued that any difficulties and hardships under which the Crones may be laboring are self-imposed. I am not overlooking that both had been familiar for years with this rather small, irregular corner lot adjoining their home in a commercial zone largely occupied by homes. Both were realtors of years’ experience and to that extent may be said to have purchased with their eyes open. The fact that in 1938 Mr. Crone actively opposed an application for a permit to operate such a station on the other side of the avenue some 480 feet from his home on the ground it would be detrimental to surrounding properties does not militate in his favor now. Nor does his present explanation that his objections were not based on personal disapproval but were aimed to help garden club friends who owned property opposite the proposed site, raise his stature or expunge the strong implications of his opposition. But we must remember this lot was available for sale before it was foreclosed for taxes, that Mr. Crone purchased it nine years ago, he now says as an investment for the son who did not return from service, and he made no effort to sell it until after his son’s death. Although I cannot say Mr. Crone exhausted every possibility in his efforts to sell, the unit of three was publicly advertised for over four years and this particular lot was orally offered to an impressive number of prospects, to no avail. He claims he never received an offer at any price for it, or any of the parcels separately or as a unit. It was not until these efforts failed and in 1951 that a service station came into the picture. In the meantime commercial use has become more pronounced in the vicinity until it has inched into the east end of this very block. Eight years elapsed between the time he purchased this property and his application for a permit to operate a service station, and in the interim he had endeavored to dispose of it for a variety of conforming uses. Under these circumstances, we cannot say this is a case where one procured property with knowledge of facts which would defeat his application for a variance to aid his venture. (Matter of Holy Sepulchre Cemetery v. Board of Appeals, 271 App. Div. 33, 40-41, supra; Matter of Thomas v. Board of Stds. & Appeals, 290 N. Y. 109, 115; People ex rel. Polcini v. Scofield, 279 App. Div. 762.) We are not confronted here with a self-created hardship which bars relief.
The plaintiffs-petitioners have satisfied me that, not only by irregular shape and by size, but by its demonstrated failure to attract a buyer or lessee, or hold a prospect, this lot is under a *1042 peculiar handicap not shared by others. The labored efforts of the town to show a feasible conforming use and the qualifications attached to suggested uses by their expert throws the difficulties into sharp relief. It is my judgment that the Crones have squarely met the demands of the rule: ‘ ‘ There must at least be proof that a particular property suffers a singular disadvantage through the operation of a zoning regulation before a variance thereof can be allowed on the ground of 1 unnecessary hardship ’ ” (Matter of Hickox v. Griffin, 298 N. Y. 365, 870-371 and cases cited).
In the proceeding the validity of the Zoning Ordinance is presumed. (Matter of Suburban Tire & Battery Co. v. Village of Mamaroneck, 104 N. Y. S. 2d 850, 854.) So, too, the assumption is fair that the town authorities believed the public interest required a commercial zone to meet the needs of the residential districts fanning out from the avenue. The growth of urban centers demands new plans from time to time, although the consequent changes are often disrupting to those most intimately concerned.
‘ ‘ No zoning plan can possibly provide for the general good and at the same time so accommodate the private interest that everyone is satisfied. While precise delimitation is impossible, cardinal is the principle that what is best for the body politic in the long run must prevail over the interests of particular individuals.” (Shepard v. Village of Skaneateles, 300 N. Y. 115,118.)
“ While stability and regularity are undoubtedly essential to the operation of zoning plans, zoning is by no means static. Changed or changing conditions call for changed plans, and persons who own property in a particular zone or use district enjoy no eternally vested right to that classification if the public interest demands otherwise.” (Rodgers v. Village of Tarrytown, 302 N. Y. 115,121; italics supplied.)
Mr. Shirley, speaking of the limited commercial use of homes along the avenue, testified the town authorities ‘ ‘ have been very careful in the use that the businesses have been put to ”, and ‘ ‘ have attempted to maintain its residential character for the protection of the property owners ”, but he was frank to say that, if an applicant submitted plans for a well-designed building for a commercial use not obnoxious or unduly detrimental to surrounding properties, under the existing rules and ordinances, the Planning Board would not deny the permit. There is no dispute that an application for a permit for commercial use within the strip cannot be denied arbitrarily, but must be founded on reason.
*1043 This same witness asserted that Monroe Avenue has posed very great difficulties for the authorities since the Zoning Ordinance was enacted, and the months spent in active consideration of the instant application, their approval and subsequent denial indicates it was no exception. Mr. Shirley testified that, as Building Inspector, he attended the meetings of the Planning Board and that, in reaching its decision, the board considered traffic hazards, nuisance and noise factors, character of the neighborhood, residential growth in the last few years, possible change in valuation of individual properties which might result from a station at this corner, public opinion and objections voiced by individuals, the fact a nursery school on the church property was becoming more active, and especially the fact that after the temporary permit was indicated on February 1 a gate was placed in the fence at the rear of the church which changed the distance from a church and playground entrance to the proposed station premises to less than 300 feet. An analysis of these reasons shows that all existed at the time the temporary permit was approved with the exception that objections were reiterated, and the gate entered the picture. This gate opened into the playground area near the north door of the church.
Frankly, the Referee is not impressed by the appearance of this mysterious gate at a crucial time in this controversy. No one connected with the church or the nursery school explained its need or purpose. Prior to that time the only access to the church either by the front door or the north door was from North St. Regis Drive. This church has occupied the site for at least 23 years and there is no evidence that in all that time people entered or left the north door by way of Monroe Avenue and Mr. Crone, who lives diagonally across the street and who testified he frequently attended social functions held at the church, claims they did not. He was not contradicted. As I understand, sometime about 1951 residents of the neighborhood organized a nursery school to be operated on the church property and an area on the north side was fenced in, presumably to confine and protect the children. At the December 4 hearing a trustee of the church, after a question had been raised by another concerning the 300 feet, advised of the existence of the rear door but, according to the minutes, said nothing of its actual or contemplated use. After the temporary permit was indicated and in the latter part of February, 1952, the unexplained gate was installed. The record is strangely silent as to why. It seems unreasonable to believe its purpose was to funnel the small charges, whom the fence had been built to protect, out onto heavily travelled Monroe Avenue. In fact, there *1044 is nothing to connect this gate in any way with the nursery school and playground. On February 28 when Mr. Gritelman appeared before the Town Board, informed them that the evening before the church board of trustees had unanimously voted opposition to the granting of a permit, and had retained him as "counsel, he apparently said nothing about any handicap in the use of the north door, the church or lawn imposed by the fence which called for correction by way of this gate, —at least it does not appear in the letter petition he there filed, or in the detailed recital of the arguments advanced by this attorney which appears in the letter from the Town Board to the Planning Board. Moreover, at the time the litigation was before me in the late summer of 1952, the grass on the east and south sides of the church lot appeared completely unworn, with not the faintest sign that it had been used as a passageway or otherwise.
It is true the Planning Board was faced with the direct 300-foot prohibition of section 16 both as to the entrance and exit of church and playground. This, according to Mr. Shirley, was one decisive factor in the rescission and denial. He said, when he taped the distance to the front church door earlier (over 300 feet), the fence blocked access from Monroe to the north door and he so reported to the board, but when the gate appeared it “ proved to the Board that they were going to use the rear entrance of the Church to get out on to Monroe Avenue ”.
I am mindful of the cardinal rule that a court has no power to substitute its judgment for that of the duly constituted authorities unless it clearly appears they acted capriciously, arbitrarily or unreasonably (Matter of Holy Sepulchre Cemetery v. Board of Appeals, 271 App. Div. 33, 42; Matter of Di Bari, 280 App. Div. 810; People ex rel. St. Albans-Springfield Corp. v. Connell, 257 N. Y. 73, 78; Little v. Young, 82 N. Y. S. 2d 909, 915; Rodgers v. Village of Tarrytown, 302 N. Y. 115,123).
“ The determination that plaintiff is entitled to judgment has been arrived at with every desire to let the zoning stand, because the zoning boards and not the courts are empowered to zone and their work is presumed to be reasonable and lawful ”. (Ulmer Park Realty Co. v. City of New York, 57 N. Y. S. 2d 713, 715.)
“ [T]he burden of establishing such arbitrariness is imposed upon him who asserts it.” (Rodgers v. Village of Tarrytown, supra, p. 121; Shepard v. Village of Skaneateles, 300 N. Y. 115, 118.)
*1045 So, here, I have hesitated to disturb the determination. But I cannot close my eyes to the fact they granted this application after a hearing and prolonged deliberation, then reversed themselves when the rising clamor of reiterated protests and the existence of the gate, unexplained and unexplored, was brought to their attention. All other considerations weighed remained the same. In view of Mr. Crone’s uncontested warning that the members never used the rear door to pass to and from Monroe, the obvious improbability of nursery children being allowed to use the gate, the timing of the installation hard on the boards’ approval of the application, and the deadly silence on any need or use of the gate, it stands as a gesture to thwart the relief sought by a newly created technicality, and is clothed with no significance warranting the acceptance of its mere existence as proof of use. According to the legal notice of December 4 hearing, the members sat as a Planning Board and Board of Appeals and, therefore, could have considered the feasibility of a variance of the 300-foot prohibition when distance was so belatedly injected into their considerations. The Town Attorney argues petitioners did not request a variance on this ground. They did not give them an opportunity so to do. While the Crones knew mention was made of the rear door at the hearing, the fence was unbroken by any opening on the south when they initiated their application and at the time the temporary permit was granted, so distance was not then in the picture. Petitioners were not informed that the gate had come to the attention of the board members after their approval of the application and within a few days of the rescission and denial. Not only is the record barren of any sound reason against a variance on this point, but is pregnant with justifications for such action.
Within the framework of time and circumstances, and on the whole record, it is my considered opinion that the action of the boards was an “ ‘ irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare ’ ” (People ex rel. St. Albans-Springfield Corp. v. Connell, 257 N. Y. 73, 82), and was unreasonable and arbitrary.
The operation of a gas station on this lot will not adversely affect development of the use to which this strip is dedicated by zoning, nor the commercial value of these residential properties. The most it will do is to detract from their value and enjoyment as homes. The record here convinces me that the planning and zoning officials of the town were very conscious of the effect of the ordinance on existing residences, and have *1046 exerted themselves for years to make the hiatus between residential and commercial use as easy as possible. The court supported them on a 1938 application. (Matter of Olp v. Town of Brighton, 173 Misc. 1079, affd. 262 App. Div. 944.) But I am convinced these residences now exist in a twilight zone that cannot be preserved forever. Commercial use, incidental and total is permeating the area. It is common knowledge that traffic has increased on this arterial thoroughfare. The residential districts to the north and south have expanded with consequent increase in buying power. Therefore, it is logical to believe that this strip set aside to serve their- needs, will develop to meet them. Mr. Shirley testified that he believed promoters want to capitalize on the circumscribed commercial area in the town and “ would like to have the whole street to build up if they possibly could ’ ’. This is not as ominous as it sounds for, of course, the type of enterprise and structure is subject to the approval of the constituted authorities, within reason. It may be in time this lot alone or in conjunction with the home lot can be devoted to a practical conforming use, but the evidence, in my judgment, does not point to a feasible permitted use of Lot 1 now or in the predictable future. The qualifications which Mr. Perkins attached to his suggested uses substantiate the claim of practical difficulties and unnecessary hardship and that a motor supply station is the only practical use at this time.
The writ is sustained. The determination of the Planning Board and the Board of Appeals denying the application should be annulled, and a temporary permit should be issued to Edward R. Crone and Nora E. Crone for a term not to exceed five years for the operation of a motor vehicle supply station on commercially zoned Lot 1, Block B, Roselawn subdivision in the Town of Brighton in accordance with the plans and specifications now on file. Without costs.
Having reached this conclusion, let us consider the disposition to be made of the action instituted contemporaneously. While it is true ‘ ‘ The right to apply for a variance of a zoning ordinance or to review a determination of a zoning board by certiorari does not deprive an owner of a cause of action attacking the validity of the zoning ordinance itself ” (Curtiss-Wright Corp. v. Village of Garden City, 185 Misc. 508, 515). “ The fundamental reason for permitting a suit in equity attacking the constitutionality of the Zoning Resolution or any statute is that no other adequate remedy is available.” (Ulmer Park Realty Co. v. City of New York, 267 App. Div. 291, 294, motion for leave to appeal denied 267 App. Div. 879.) Since adequate *1047 remedy here is provided by the writ of certiorari, the complaint in the action is dismissed, without costs.
Defendants-respondents ’ motion for a dismissal of the petition in the proceeding made at the end of petitioners’ case and renewed at the close of proofs, on which decision was reserved, is denied with exception.
Plaintiffs-petitioners ’ motion for judgment on the complaint and in the proceeding, on which decision was reserved, is denied as to the complaint, and is granted in the proceeding, with exception as to each.
Findings of fact and conclusions of law shall be submitted in accordance herewith.